**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**FURLANDARE SINGLETON, Individually And as**
**Administrator of the Estate of Dequan Singleton,**
**Syndi Singleton, and Haylee Singleton,**
**Decedents; and CLYDE HATCHETT, Individually,**
**and as Administrator of the Estate of Emily**
**Beavers, Deceased**                                              **PLAINTIFFS**

**V.**                            **NO. 4:15-cv-00205-KGB**

**ARKANSAS HOUSING AUTHORITIES PROPERTY**
**& CASUALTY SELF-INSURED, INC. (specifically,**
**The Jacksonville Housing Authority, A.K.A.**
**The Max Howell Place Housing Projects);**
**EVANTSON INSURANCE COMPANY, an Illinois**
**Corporation; PHIL NIX, in His Individual and Official**
**Capacity as Executive Director of The Jacksonville**
**Housing Authority; and JACKSONVILLE FIRE DEPT,**
**a department of the CITY OF JACKSONVILLE,**
**ARKANSAS, Jointly and Severally and in their**
**individual capacities; JOHN DOE(s) 1-50;**
**and JANE DOE(s) 1-50**                                          **DEFENDANTS**

**AND**

**MARILYN LOUISE BEAVERS, Individually, And as**
**Administrator of the Estate of MARILYN BEAVERS,**
**Deceased**                                                       **PLAINTIFFS**

**V.**

**ARKANSAS HOUSING AUTHORITIES PROPERTY**
**& CASUALTY SELF-INSURED, INC. (Specifically,**
**THE JACKSONVILLE HOUSING AUTHORITY, a/k/a**
**THE MAX HOWELL PLACE HOUSING PROJECTS);**
**EVANSTON INSURANCE COMPANY, an Illinois**
**Corporation; PHIL NIX, in His Individual and Official**
**Capacity as Executive Director of THE JACKSONVILLE**
**HOUSING AUTHORITY; BRK BRANDS, INC.;**
**CITY OF JACKSONVILLE; JACKSONVILLE FIRE DEPT;**

1

**ENGINEER WAYNE TAYLOR, Individually, and in his
official capacity; CAPTAIN LARRY HAMSHER, individually
and in his official Capacity; ENGINEER CHRIS McDONALD,
Individually, And in his official capacity; FIREFIGHTER TONY
SUTHERLAND, individually and in his official Capacity;
CAPTAIN DEWAN LEWIS, individually, And in his official capacity;
and JOHN DOES 1-5**                        **DEFENDANTS**

## BRIEF IN SUPPORT OF SEPARATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Comes now the Separate Defendants, Wayne Taylor, Captain Larry Hamsher, Chris McDonald, Tony Southerland, Captain Dewan Laws, in their individual and official capacities and the City of Jacksonville, Arkansas, by and through undersigned counsel, and for their Brief in Support of Separate Defendants' Motion for Summary Judgment, state:

## I.    INTRODUCTION

During the early morning hours of March 22, 2012, Marilyn Beavers, and her children, Emily Beavers, Dequan Singleton, Syndi Singleton, and Haylee Singleton died after the kitchen of their apartment in Jacksonville caught fire. As unimaginably tragic as these events are, the Plaintiffs' claim that the City of Jacksonville and its fire fighters are responsible is without basis. The officers responded to a call from Ms. Beavers' neighbor that she smelled smoke in her apartment; Ms. Beavers' apartment abutted the caller's. The officers believed the smell was coming from a fire the City was fighting a half-mile away but still investigated the source of the smell; the officers found nothing to indicate a fire was blazing.

Despite this, the Plaintiffs claim that the responding fire fighters caused the death of Ms. Beavers' and her children and thus violated the law. There is, however, no causal connection between the fire fighters' actions or inactions and the deaths of Ms. Beavers

2

and her children.  Even if there were, the Plaintiffs can point to no right the City or its fire fighters violated.  For those reasons, the Plaintiffs' claims fail and the City and its fire fighters are entitled to summary judgment.

## II.    FACTUAL BACKGROUND

According to the Plaintiffs, "moments after the family's 2:00a.m. phone conversation, a fire ignited in Apartment 3-A, Max Howell Place." *Amended Complaint,* ¶ 35.  "The fire was primarily confined to the kitchen with some extension into the attic and dining area." *SUMF* ¶ 51.  Ms. Beavers' and her children died of soot and smoke inhalation as a result of this "accidental house fire." *Defendants' Statement of Undisputed Material Facts* ("*SUMF*") ¶ 50.

At 5:46am, nearly four hours after the fire began, Jennifer Gray called 911 and reported that she smelled smoke inside her apartment in the Max Howell Place apartments. *Defendants' Statement of Undisputed Material Facts* ("*SUMF*") ¶ 1. At the same time, the Jacksonville Fire Department was fighting a different fire approximately a "half mile away" across the interstate. *SUMF* ¶ 2. Because of the other fire, the 911 dispatcher told Ms. Gray that "across the interstate, we have a fire . . . and the wind would carry [the smoke] that way." *SUMF* ¶ 3.  Ms. Gray insisted, however, that she smelled smoke inside her home and she only smelled it in her daughter's room and her bathroom. *SUMF* ¶ 4.  The dispatcher then advised Ms. Gray to get her daughter out of the house (Ms. Gray's daughter was not home) and go outside to see if she smelled smoke outside, too. *SUMF* ¶ 5.  Ms. Gray went outside, but she did not smell smoke outside the apartment. *SUMF* ¶ 6.  The dispatcher told her, "Ok, I'm going to have an engine out there as soon as possible." *SUMF* ¶ 7.

At 5:50am, the Jacksonville Fire Department was dispatched to Ms. Gray's home. *SUMF* ¶ 8. Officers Tony Southerland and Chris McDonald, who were working the fire approximately a "half mile away" across the interstate, arrived first at 6:00am – these two officers were working at the time as medics and were in an ambulance ("Medic 2") and not a fire engine. *SUMF* ¶ 9. Captain Larry Hamsher and Lieutenant Wayne Taylor arrived two minutes later in a fire engine ("Engine 4"). *SUMF* ¶ 10.

Upon their arrival, and during the two minutes before Hamsher and Taylor arrived, McDonald made contact with Ms. Gray, "who was standing outside." *SUMF* ¶ 11. Ms. Gray told McDonald "she had smelled smoke earlier and it had went away . . . and that she had smelled smoke again, and that's when she called 911." *SUMF* ¶ 12. After this brief conversation, McDonald "made a quick walk through just prior to the arrival of Engine 4 . . . to make a quick observation of the entire residence to see if there was any obvious smoke, fire, or anything that needed to be noted . . . There was none." *SUMF* ¶ 13. Southerland, too, went in to Ms. Gray's apartment:

> I proceeded down the hallway, feeling low and high down the halls. Opened each door that -- the doors were closed. When I got to the end of the hallway, I felt that wall and come back down the other wall feeling low and high. And it had kind of a low ceiling, so I was able to reach up and put my hand on the back of the ceiling. *SUMF* ¶ 14.

All told, Southerland placed the back of his hand on "all the walls in every room" of Ms. Gray's apartment. *SUMF* ¶ 15. And, like McDonald, Southerland "could not feel any heat" during his search. *SUMF* ¶ 16.

It should be noted that Ms. Gray's apartment is a mirror image of Ms. Beaver's, and the two apartments share a common wall. *SUMF* ¶ 17. On either side of that common wall is the same room of both apartments – bedroom 3, a closet, the full bath, the pantry,

and the storage area/room of one apartment share a wall with the other apartments' counterpart. *SUMF* ¶ 18. Again, Southerland detected no heat from any of those walls; nor did Southerland smell any smoke. *SUMF* ¶ 19.

Southerland then left Ms. Gray's apartment and went to the front door of Apartment 3A, Ms. Beavers' apartment, and "banged on the door very loudly" to see if the occupants of that apartment "experienced any smoke." *SUMF* ¶ 20. While banging, he said "Jacksonville Fire Department. Could you come to the door, please." *SUMF* ¶ 21. However, Southerland heard no movements inside Ms. Beavers' apartment. *SUMF* ¶ 22. Southerland then looked through a small slit in the bottom of a pulled down curtain covering a window on the front ("A") side of the apartment while standing three inches away. *SUMF* ¶ 23. The window was part of a bedroom ("Bedroom 3"), and there was a light on in Bedroom 3. *SUMF* ¶ 23. All of the other windows on the A side of the apartment had a mesh screen that prevented Southerland from seeing inside. *SUMF* ¶ 24. While looking through the slit in that window, Southerland was able to see across Bedroom 3 into the hallway and also what he thought was a bathroom. *SUMF* ¶ 25. Southerland saw nothing to indicate a fire was blazing: "Q: And into the areas where you could see, you saw no hint of smoke; haze; or fire?  A: No, ma'am.. *SUMF* ¶ 26.

Hamsher and Taylor arrived on the scene just as Southerland was heading back to Ms. Gray's apartment after checking the window of Ms. Beavers' apartment. *SUMF* ¶ 27.  Upon his arrival, Hamsher instructed McDonald to proceed with a thermal image scan of the entire interior of Ms. Gray's residence since no fire was indicated after the officers "examin[ed] the residence by senses: look, feel, touch." *SUMF* ¶ 28.  "[T]he fact that our sight nor our feel nor our hearing indicated any hostilities, any extreme heat or

any that would indicate to us that there was a fire," meant that the thermal imager was "next in line in the investigative process." *SUMF* ¶ 29.

The thermal imager "detects variations in heat;" for instance, the thermal imager could determine whether a wall was 150, 200, 700, or even 1000 degrees Fahrenheit. *SUMF* ¶ 30.  When the thermal imager detects elevated temperatures, that is evidence that there might be a fire. *SUMF* ¶ 31.

In scanning Ms. Gray's apartment, McDonald "proceeded in a 'Z' pattern from the initial walk into the room. *SUMF* ¶ 32. Again over the top, down all the way around;" he then performed a "'Z' of the wall and then went vertical in different patterns to find any temperature variance."  This would have been done "on the inside of the wall and worked around the entire residence." *SUMF* ¶ 32. During this 'Z' pattern search, the temperatures were between 65 and 73; these temperatures were "normal . . . room temperature." *SUMF* ¶ 33.

Hamsher ordered a thermal image scan of Ms. Gray's attic area; this area is shared by both Ms. Beavers' apartment and Ms. Gray's. *SUMF* ¶ 34.  McDonald retrieved a ladder from the fire engine, and Taylor volunteered to scan the attic. *SUMF* ¶ 35.  While he did not crawl through the attic, Taylor climbed the ladder and used the thermal imager to look for "visible signs of, you know, heat and -- and flames." *SUMF* ¶ 36. The thermal imager registered about 77 degrees; "it was a little different; because the attic might have been a little bit, you know, hot.  But it wasn't a visible difference." *SUMF* ¶ 37.  Taylor found nothing to indicate that a fire was occurring. *SUMF* ¶ 38, ("Q: And did you conclude after you used the thermal imager on the entire crawlspace in the attic,

which included Ms. Beaver's apartment, that there was no evidence of any fire; smoke; or other indications of a fire?  A: Yes, ma'am.").

Meanwhile, Hamsher ordered Southerland to try again to make contact with any occupants in Ms. Beavers' apartment; and, too, Hamsher ordered Taylor to do a perimeter search with the thermal imager for signs of fire or smoke. *SUMF* ¶ 39.  Southerland returned to Ms. Beavers' apartment and, like before, banged on the door "quite loudly" identifying himself as a fire fighter. *SUMF* ¶ 40. And, like before, Southerland "could not get a response." *SUMF* ¶ 41.

Hamsher then ordered his officers to go back into Ms. Gray's apartment to do a "secondary investigation." *SUMF* ¶ 42. Once again, no signs were found that would indicate fire was occurring. *SUMF* ¶ 43.  After the second inspection was finished, all four fire fighters left the scene – 23 minutes after arriving. *SUMF* ¶ 44.

### III.   STANDARD OF REVIEW

A motion for summary judgment is proper and appropriate when there is no genuine issue of material fact, "so that the dispute may be decided on solely legal grounds." *Kidd v. Bass Hotels & Resorts, Inc.*, 136 F. Supp. 2d 965, 967 (E.D. Ark. 2000) (citing *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987)); Fed. R. Civ. P. 56.  As the United States Court of Appeals for the Eighth Circuit recognizes, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Wabun-Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir. 1990) (quoting *Celotex Corp v. Catrett*, 477 U.S. 317, 323-324 (1986)).

The party moving for summary judgment has the initial burden of informing the court of the basis for its motion and identifying the pleadings, admissions, discovery documents, and affidavits it contends show the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. However, the moving party does not have the burden of *negating* the other party's claim; the movant meets its burden merely by "pointing out" to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* At 325.

Facts are reviewed in the light most favorable to the non-movant, and the non-movant also receives the benefit of any inferences that can be drawn from the facts. *Beal v. Old Reliable Cas. Co.*, No. 4:14–CV–04079, 2014 WL 4230851, at *1 (W.D. Ark. Aug. 26, 2014) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the non-movant must reveal specific facts showing a genuine issue rather than relying on "metaphysical doubt." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) *(en banc)*. Speculation or suspicion will not be able to withstand a motion for summary judgment. *Nat'l Bank*, 165 F.3d at 607. The nonmoving party must go beyond its own pleadings to designate specific facts raising a genuine triable issue. *Celoxtex*, 477 U.S. at 324; *see also Counts v. MK-Ferguson Co.*, 862 F.d 1338, 1339 (8th Cir. 1988).

In order to establish a genuine issue of material fact exists, the nonmoving party must show that (1) there is a factual dispute, (2) the disputed fact is material to the outcome of the case, and (3) the dispute is genuine. *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995). A dispute is genuine only if a reasonable jury could return a verdict for either party. *Id.*; *Anderson*, 477 U.S. at 248; *see also*

*McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 510 (8th Cir. 1995). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather the dispute must be outcome determinative under prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

## IV.   <u>ARGUMENT</u>

In short, the Plaintiffs' claims are that the City, and its fire personnel, owed a duty to "properly inspect the perimeter for indication of and/or fire and warn of all hazards," a duty "to address the risk of harm to Decedents," and that the City failed to "train its employees in life-saving techniques, and its custom and policy of indifference, condoned the deliberate indifference displayed towards the Decedents." *Amended Complaint*, 30 & 31. This, according to the Plaintiffs, amount to a Fifth and Fourteenth Amendment violation and a Wrongful Death claim.

Even if such a duty existed, which it does not, the Plaintiff has not offered, and cannot offer, any evidence that any action, or inaction, by the City of Jacksonville or any of its employees caused the death of Ms. Beavers' and her children. As such, the Plaintiffs claims fail, and the City of Jacksonville, Hamsher, McDonald, Southerland, and Taylor are entitled to summary judgment.

### A.   **Each of the Plaintiffs' Causes of Action Fail Because There is No Causal Link Between the City's Actions and Ms. Beavers' and Her Children's' Death**

Regardless of the claim, the Plaintiffs must establish a causal connection between the City's actions and the deaths of Ms. Beavers and her children. As for the Plaintiffs §1983 claims, the Eighth Circuit has noted that "by specifically imposing liability for the torts of another person if one 'caused' the tort to be committed, the statutory language

suggested that Congress 'did not intend § 1983 liability to attach where such causation was absent.'" *City of Springfield, Mass. v. Kibbe*, 480 U.S. 257, 266 (1997), *citing Monell v. New York City Dept. of Social Services,* 436 U.S. 658 (1978).   The same is true for the Plaintiffs' wrongful death and negligence claims, "proximate causation is a foundational element" of those claims, too. *Simpson Hous. Sols., LLC v. Hernandez*, 2009 Ark. 480, 31, 347 S.W.3d 1, 19 (2009).

The Plaintiffs have offered nothing to establish that the actions or inactions of the City or its fire fighters caused the deaths of Ms. Beavers' and her children.   On the contrary, the Plaintiffs allege that the fire started "moments after the family's 2:00 a.m. phone conversation." *Amended Complaint*, page 8.   The fire fighters arrived four hours later, and it is undisputed that no fire was ongoing at that time.   And, the Plaintiffs have no evidence Ms. Beavers or her children were alive when the fire fighters arrived.

Thus, considering the fire killed all those inside Ms. Beavers' apartment and considering that no fire was ongoing when fire fighters arrived, there is nothing the fire fighters could have done to prevent the deaths and, more importantly, nothing they could have done to cause the deaths of Ms. Beavers and her children.   As such, no violation could have occurred, and the City and its fire fighters are entitled to summary judgment.

**B.     The Plaintiffs' Constitutional Claims Fail Because No Violation Occurred and, Even If One Had Occurred, the Officers Are Entitled to Qualified Immunity.**

"Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Johnson v. Carroll*, 658 F.3d 819, 825 (8th Cir. 2011). In deciding the immunity question, the court should "ask whether the

agents acted reasonably under settled law in the circumstances, not whether another reasonable or more reasonable interpretation of the events can be constructed." *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). This immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Brockinton v. City of Sherwood*, 503 F.3d 667, 672 (8th Cir. 2007) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

A court required to rule upon the qualified immunity issue must consider whether, taken in the light most favorable to the plaintiff, the facts show the violation of a constitutional right. *Saucier v. Katz*, 553 U.S. 194, 200 (2001). If the answer to this question is no, then the official is entitled to qualified immunity; however, if the facts as construed could make out a violation, then a second inquiry is required. *Id*.

The second inquiry is to determine whether the right is clearly established. *Id*. In order for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (emphasis added). The contours of the right "must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011). Courts are "not to define clearly established law at a high level of generality . . . [t]he dispositive question is 'whether the violative nature of particular conduct is clearly established.'" *Mullenix*, 136 S.Ct. at 308 (citing Al-Kidd, 563 U.S. 731). According to the Court, "[t]his inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" Id., citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curium). "Put simply, qualified immunity

protects 'all but the plainly incompetent or those who knowingly violate the law.'"
*Mullenix*, 136 S.Ct. at 308.

### 1.    No Constitutional Violation Occurred Because No Constitutional Right Existed

Even assuming that a causal connection could be made, the Plaintiffs' claims still fail because no Constitutional duty exists to "provide a certain degree of competence in its services or else violate the constitution." *Jackson v. Byrne*, 738 F.2d 1443, 1446 (7th Cir. 1984); *cited with approval in, Wells v. Walker,* 671 F. Supp. 624, 627 (E.D. Ark. 1987), aff'd, 852 F.2d 368 (8th Cir. 1988).   While not in the fire protection context, the Eighth Circuit agrees, too; "the Constitution imposes no obligation on the State to provide perfect or even competent rescue services." *Dodd v. Jones*, 623 F.3d 563, 568 (8th Cir. 2010) (citing 318 F.3d 473, 478 (3d Cir. 2003); *see also Bradberry v. Pinellas County*, 789 F.2d 1513, 1517 (11th Cir. 1986) ("The Constitution, as opposed to local tort law, does not prohibit grossly negligent rescue attempts nor even the grossly negligent training of state officers.").

This is not to imply that the City of Jacksonville or its fire fighters were incompetent or neglectful in the early morning hours of March 22, 2012 – that is certainly not the case – the quotes above only establishes that the Plaintiffs' Constitutional claims fail because no right exists to violate.

In *Jackson*, two children – Santana Jackson and Tommie Jackson – lost their lives during a fire in their apartment building in Chicago. *Jackson,* 738 F.2d at 1444.   At the time of the fire, many of Chicago's firefighters were on strike, and the fire station closest to the Jacksons' building was unmanned and being picketed by four fire fighters. *Id.*   The mayor ordered police to bar striking fire fighters from entering the building. *Id.*   When

the four fire striking fighters noticed the nearby burning building, they attempted to enter the fire station but were stopped by police. *Id.*   A fire truck from a manned fire station arrived thirteen minutes later and the four striking firefighters helped that crew extinguish the blaze but not before Santana and Tommie had died. *Id.*  The family of Santana and Tommie filed suit against the City, among several others, and claimed violations of the Fifth, Eight, and Fourteenth amendments and a state wrongful death claim. *Id.*  The district court granted summary judgment on the federal claims and "exercised its discretion not to hear the remaining state law claims." *Id.* at 1445.  The Seventh Circuit agreed. *Jackson, supra.*

The Seventh Circuit first noted that the Fifth and Eighth Amendments are not cognizable because the City, and its officials, were not federal actors; the same is true here. *Id.*  As for the Fourteenth Amendment, the court held that "[a]lthough there were deaths in this case, the state did not, within the meaning of the Fourteenth Amendment, 'deprive' plaintiffs' decedents of life." *Jackson*, 738 F.2d at 1446.  The court went to note that, "[t]he fire killed Santana and Tommie Jackson, government officials did not. Our analysis would no doubt be different if government officials set the fire or placed forces in motion which ignited the fire that claimed the lives of the Jackson children."

A number of federal courts agree with *Jackson*.  "[The Constitution does not create an affirmative entitlement to fire protection for due process purposes." *Bush v. City of Utica*, 948 F. Supp. 2d 246, 255 n.6 (N.D.N.Y. 2013) (citing *Jackson, supra*; *Estate of Morgan v. Mayor of Hampton*, 936 F. Supp. 343, 347-348 (E.D. Va. 1996); *Westbrook v. City of Jackson*, 772 F. Supp. 932, 935-936 (S.D. Miss. 1991)).  At least two courts, in particular, have even held that a city is not "constitutionally required to provide <u>adequate</u>

fire protection, even though the municipality has <u>undertaken</u> such service." *Reedy v. Mullins*, 456 F. Supp. 955, 958 (W.D. Va. 1978) (emphasis added) (citing *Shortino v. Wheeler*, 531 F.2d 938 (8th Cir. 1976)); *see also Estate of Morgan*, 936 F. Supp. at 348.

The same is true here as it was in *Jackson*; there is no allegation that the City of Jacksonville or any of its fire fighters set fire to Ms. Beavers' apartment nor is there an allegation that any of the City's fire fighters set in motion anything that ignited the fire. In fact, it is undisputed that by the time the officers arrived on the scene, the fire was extinguished.  As such, the Plaintiffs' Fourteenth Amendment claim fails, and the City and its officers are entitled to summary judgment.

Even if such a duty existed, the four officers did not fail to provide what the Plaintiffs believe Ms. Beavers and her children were entitled.  Four officers responded to the 911 call; the officers met and made contact with Ms. Gray; the officers conducted an initial walk through of her apartment and felt each wall for heat; the officers conducted a thermal image scan of the interior of Ms. Gray's apartment not once, but twice; the officers conducted a thermal image scan of the common attic space; and the officers twice attempted to make contact with Ms. Beavers in an attempt to find evidence of a fire. *SUMF* ¶¶ 8-44.  At most, the fire fighters missed evidence that a fire *had occurred*; this, however, does not establish that the fire fighters violated any alleged duty to protect. Without more, both legally and factually, the Plaintiffs can offer nothing to establish that any of the fire fighters' actions fell below any alleged duty of care – even if one existed.

### 2.    The Individual Defendants at the Scene Are Entitled to Qualified Immunity as to the § 1983 Claims

Even if a causal connection could be made and even if a duty of care existed and even if the fire fighters violated that duty of care, they are each entitled to qualified

immunity as no reasonable officer would know that their actions on March 22, 2012 would violate a clearly established right.  As such, the fire fighters are entitled to summary judgment.

Again, in order for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix, supra,* (emphasis added).  Here, there is no right to violate, and even assuming there is, there is no case law to place the constitutional question beyond debate.  Thus, the four officers at the scene are entitled to qualified immunity.

### C. The Plaintiffs' Official Capacity[1] Claims Fail, Too; No Violation Occurred and No Policy, Practice, or Custom Led to Any Violation

First, and most importantly, because there is no underlying constitutional violation, the City cannot be held liable. *See City of Los Angeles v. Heller*, 475 U.S. 796 (1986).  Even assuming a violation occurred does nothing to change the City's entitlement to summary judgment.  A city may be subject to § 1983 liability only when a municipal policy or custom caused the alleged constitutional injury at issue. *Id*. At 1074-1075.  Here, no such policy or custom existed.

The Plaintiffs offer nothing to establish either that a policy or custom existed or that it caused any constitutional injury.  "[A] municipal <u>policy</u> is not unconstitutional if it might *permit* unconstitutional conduct in some circumstances, it is unconstitutional only if it '*requires* its officers to act unconstitutionally." *Handle v. City of Little Rock*, 772

---

[1] Official-capacity suits, "generally represent only another way of pleading an action against an entity of which an officer is an agent . . . [A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (internal citations omitted).

F. Supp. 434, 438 (E.D. Ark. 1991) (emphasis in the original).  To be held liable for any alleged <u>custom</u>, the Plaintiffs must show that the City of Jacksonville officials had notice of and exhibited deliberate indifference to "a prior pattern of unconstitutional conduct that is so 'persistent and widespread' as to have the effect and force of law." *Andrews v. Fowler*, 98 F.3d 1069, 1074-1075 (8th Cir. 1996) (citing *Monell*, 435 U.S. at 691).

Here, the Plaintiffs have failed to put forth any evidence of a municipal policy that required the fire fighters to engage in the alleged acts, which the Plaintiffs claim are unconstitutional. Furthermore, the Plaintiffs have put forth no evidence that the City had notice of "a prior pattern of unconstitutional conduct that is so 'persistent and widespread'" as to constitute deliberate indifference.  For those reasons, the City is entitled to summary judgment.

### D. The Plaintiffs' *Failure to Train* Claims Fail Against Captain Larry Hamsher and the City of Jacksonville[2]

Because no constitutional violation occurred, no 'failure to train' claim exists; without an underlying constitutional violation, there can be no individual liability against Hamsher, and no municipal liability for the City of Jacksonville or the Jacksonville Fire Department. *Brockinton v. City of Sherwood*, 503 F.3d 667, 673 (8th Cir. 2007).

Even if an underlying constitutional violation had occurred, the failure to train must amount to deliberate indifference to the rights of those persons. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Establishing a failure to train claim requires that

---

[2] The Plaintiffs claim Captain Dewan Laws is liable, too, for his failure to train these officers. However, Captain Laws did not have any involvement with the fire at the Max Howell apartment complex, nor did he have any responsibilities in training any of the officers involved. *SUMF* ¶ 46. As such, no claim could exist against him, and he is entitled to summary judgment.

Hamsher and/or the City "(1) had notice of a pattern of unconstitutional acts committed by subordinates; (2) was deliberately indifferent to or tacitly authorized those acts; (3) failed to take sufficient remedial action; (4) proximately causing injury to [the decedents]." *Livers v. Schneck*, 700 F.3d 340, 355 (8th Cir. 2012) (quoting *Jane Doe A. v. Special Sch. Dist. of St. Louis Cnty.*, 901 F.2d 642, 645 (8th Cir. 1990) (internal quotations omitted)).  "[D]eliberate indifference is a subjective standard that "entails a level of culpability equal to the criminal law definition of recklessness." *B.A.B., Jr. v. Bd. of Educ. of St. Louis*, 698 F.3d 1037, 1040 (8th Cir.2012); see Liebe v. Norton, 157 F.3d 574, 579 (8th Cir.1998).  To succeed on this claim, the Plaintiffs "must prove [Hamsher] personally knew of the constitutional risk posed by [his] inadequate training or supervision" of the others officers. *S.M. v. Krigbaum*, 808 F.3d 335, 341 (8th Cir. 2015).  The Plaintiffs have offered nothing to establish this and summary judgment is thus appropriate.

First, and foremost, there is no evidence that Hamsher or the City had "notice of a pattern of unconstitutional acts committed by subordinates." *Livers*, 700 F.3d at 355. In fact, there is no evidence on the record that any unconstitutional act occurred previously which could have put the Captains or the City on any sort of notice. To put a supervisor on notice, the unconstitutional acts of inferior employees must be <u>very similar</u> to the conduct giving rise to liability – a strict standard. *See Id.* At 356 (holding that dishonest acts of a subordinate were not sufficiently similar to falsifying evidence to impose supervisor liability); *Jane Doe A.*, 901 F.2d at 646 n.4 (holding notice of an employee's sexual misconduct with adults did not provide notice of his sexual misconduct with children). Here, there is no evidence to illustrate that Hamsher or the City would

have known of *any* deliberate indifference to the due process rights of citizens of Jacksonville that would give notice sufficient to rise to supervisor or municipal liability.

Without notice of any such act, there is nothing to be deliberately indifferent to or to "tacitly authorize;" as such, the second element fails, too. And, without notice of any prior unconstitutional acts by officers at the department or any deliberate indifference by either Hamsher or the City, they cannot be said to have "failed to take sufficient remedial action." *Livers v. Schneck*, 700 F.3d 340, 355 (8th Cir. 2012).

Finally, without any other element being established, there can be no causational link between the Captains, nor the City, and any constitutional violation. Therefore the third and fourth elements of the Plaintiff's failure to train claim fail as well, and Hamsher and the City are entitled to summary judgment. Hamsher, too, is entitled to qualified immunity because even if a failure to train claim were established, there is nothing to indicate that the right he violated was clearly established.

E.   **The Individual Defendants Are Entitled to Statutory Immunity as to the Plaintiffs' Remaining State Law Claims**

According to Ark. Code Ann. § 19-10-305(a):

Officers and employees of the State of Arkansas are immune from liability and from suit, except to the extent that they may be covered by liability insurance, for damages for acts or omissions, other than malicious acts or omissions, occurring within the course and scope of their employment.

Malice has been defined by the Supreme Court of Arkansas as "an intent and disposition to do a wrongful act greatly injurious to another." *Early v. Crockett*, 2014 Ark. 278, at 15, 436 S.W.3d 141, 150 (quoting *Fuqua v. Flowers*, 341 Ark. 901, 905-906, 20 S.W.3d 388, 391 (2000)) (quoting *Satterfield v. Rebsamen Ford, Inc.*, 253 Ark. 181, 185, 485 S.W.2d 192, 195 (1972)). The Arkansas Supreme Court further defined malice as:

the intentional doing of a wrongful act without just cause or excuse, with an intent to inflict an injury or under circumstances that the law will imply an evil intent. . . A conscious violation of the law. . . which operates to the prejudice of another person. A condition of the mind showing a heart. . . fatally bent on mischief.

*Early*, 2014 Ark. at 15, 436 S.W.3d at 150-151 (quoting *Fuqua v. Flowers*, 341 Ark. 901, 905-906, 20 S.W.3d 388, 391 (2000)) (quoting *Black's Law Dictionary*, 956-57 (6th ed. 1990)).

Though the Plaintiffs have alleged various omissions on the part of the City Defendants, they have not suggested that these alleged omissions were motivated with malice or the intent to cause harm.  In fact, in their Complaint, the Plaintiffs frame both the wrongful death and survival damages in terms of the "result of Defendants' negligence. . ." *Amended Complaint*, ¶¶ 61, 65.  Negligence alone is not enough to overcome statutory immunity. *See Early*, 2014 Ark. at 14-16, 436 S.W.3d at 150-151.  For example, in *Early v. Crockett*, the Supreme Court of Arkansas found that employees of the Arkansas Department of Corrections ("ADC") would not have acted with malice even if they "had ignored ADC's policies and procedures and did not take adequate steps to protect Early from harm by another inmate." *Id*. 2014 Ark. at 16, 436 S.W.3d at 151.  To analogize to the case at hand, even if the City Defendants did not take adequate steps to protect the decedents, that in and of itself would not be enough to establish malice; thus, the City and its officers are entitled to summary judgment as to these claims, too.

## CONCLUSION

For the reasons stated herein, Officer Taylor, Captain Hamsher, Officer McDonald, Officer Southerland, Captain Laws, and the City of Jacksonville are entitled to summary judgment on all of Plaintiffs' claims.

Respectfully Submitted,

WAYNE TAYLOR; Individually, and in his
official capacity; CAPTAIN LARRY
HAMSHER, individually and in his
official Capacity; ENGINEER CHRIS
McDONALD, Individually And in his
official capacity; FIREFIGHTER TONY
SUTHERLAND, individually and in his
official Capacity; CAPTAIN DEWAN
LEWIS, individually, And in his official
capacity; JACKSONVILLE FIRE
DEPARTMENT (CITY OF
JACKSONVILLE) and THE CITY OF
JACKSONVILLE, ARKANSAS,
Separate Defendants

By:       /s/ John L. Wilkerson
John L. Wilkerson, Ark. Bar No.
2008046
Attorney at Law
Post Office Box 38
North Little Rock, AR 72115
TELEPHONE:  (501) 978-6136
FACSIMILE:  (501) 978-6567
EMAIL:  jwilkerson@arml.org

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of August, 2016, I have electronically filed the foregoing document with the Clerk of Court, which will send notification to all registered users of the electronic filing system below, and I further certify that I have mailed a true and correct copy of this document to all non-participating counsel of record listed below via U.S. Mail, Postage Prepaid:

John W. Walker, Esq.
Shawn G. Childs, Esq.
John W. Walker, P.A.
1723 S. Broadway
Little Rock, AR 72206

William M. Hatchett, Esq.
Hatchett, Dewalt, & Hatchett
485 Orchard Lake Rd.
Pontiac, MI 48341

William M. Griffin, III
Friday, Eldredge, & Clark, LLP
400 W. Capitol Ave., Ste. 2000
Little Rock, AR 72201

James H. Heller
Cozen O' Conner
1900 Market St.
Philadelphia, PA 72201

Kathryn A. Pryor
Wright Lindsey & Jennings
200 West Capitol Ave., Ste. 2300
Little Rock, AR 72201

Kathy A. Pryor
Wright Lindsey & Jennings
200 West Capitol Ave., Ste. 2300
Little Rock, AR 72201

David Hodges
Attorney at Law
212 Center St., 5th Fl.
Little Rock, AR 72201-2429

E. Dion Wilson
Attorney at Law
423 Rightor Street
Helena, AR 72342

Shawn Childs
Attorney at Law
1723 South Broadway
Little Rock, AR 72206

Sheila F. Campbell
Attorney at Law
2510 Percy Machin
North Little Rock, AR 72114

/s/ John L. Wilkerson
John L. Wilkerson, Ark. Bar No.
2008046