# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

**FURLANDARE SINGLETON,** *et al.*                                         **PLAINTIFFS**

**v.**                            **Case No. 4:15-cv-205-KGB**

**ARKANSAS HOUSING
AUTHORITIES PROPERTY
& CASUALTY SELF-INSURED
FUND, INC.,** *et al.*                                                       **DEFENDANTS**

## OPINION AND ORDER

Before the Court are a motion for summary judgment and supplemental motion for summary judgment filed by separate defendant BRK Brands, Inc. ("BRK") (Dkt. Nos. 88; 179). Plaintiff Marilyn Beavers filed a response to BRK's motion for summary judgment and supplemental motion for summary judgment (Dkt. No. 191). Separate plaintiffs Furlandare Singleton and Clyde Hatchet filed a motion to adopt and incorporate by reference Ms. Beavers' response (Dkt. No. 194). BRK filed a reply to plaintiffs' response (Dkt. No. 197).

The Court grants Mr. Singleton and Mr. Hatchet's motion to adopt (Dkt. No. 194). *See* Fed. R. Civ. P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion.").

In the early morning hours of March 22, 2012, Ms. Beavers and her children, Haylee Singleton, Dequan Singleton, Emily Beavers, and Syndi Singleton, died after a fire in the kitchen of their apartment in Jacksonville. These events are unimaginably tragic. This Court has studied carefully and thoroughly the filings and record evidence in this case. For the following reasons, the Court grants BRK's motion for summary judgment and supplemental motion for summary judgment (Dkt. Nos. 88; 179). The Court dismisses with prejudice all claims against BRK.

## I.  Hearing

As a preliminary matter, the Court notes that Ms. Beavers requested a hearing on BRK's motion for summary judgment and supplemental motion (Dkt. No. 191, ¶ 5).  Through informal communications between counsel and the Court, Ms. Beavers withdrew her request for a hearing. Therefore, the Court denies as moot Ms. Beavers' request for a hearing.

## II.  Legal Standard

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law."  *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

Parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997).

The nonmoving party "must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial" and "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012) (citing *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th

Cir. 2011) (en banc)).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.    Background

The following facts are taken from plaintiffs' response to BRK's statement of material facts as to which there is no genuine dispute (Dkt. No. 193).  On March 22, 2012, Marilyn Beavers and her children Haylee Singleton, Dequan Singleton, Emily Beavers, and Syndi Singleton were in Ms. Beavers' apartment (*Id.*, at 2).  At approximately 2:30 a.m., Ms. Beavers and all of the children spoke on the phone with Furlandare Singleton.  After that conversation ended, a fire ignited in Ms. Beavers' apartment (*Id.*).  Ms. Beavers became aware of the fire and attempted to extinguish it (*Id.*, at 3).[1]  However, Ms. Beavers and the children ultimately died from smoke inhalation suffered during the fire (*Id.*, at 4).  When the fire occurred, a Model 1839WN smoke alarm, which was manufactured by BRK, was installed in the hallway of Ms. Beavers' apartment (*Id.*, at 3).

## IV.    Motion For Summary Judgment

Ms. Beavers, Mr. Singleton, and Mr. Hatchett allege that Ms. Beavers and the children died of smoke inhalation because the BRK smoke alarm in Ms. Beavers' apartment failed to sound an

---

[1] Ms. Beavers admits in part and denies in part BRK's statement of fact number 4, which is that "Marilyn Beavers was aware of the fire and attempted to extinguish the fire" (Dkt. No. 193, at 3).  In support of its fourth statement of fact, BRK cites the following factual allegation made in plaintiffs' amended complaint:  "[u]pon information and belief, Decedent Marilyn Beavers recognized the blaze and fought in an effort to extinguish the fire and save her children" (Dkt. No. 27, ¶ 37).  In her response to BRK's statement of facts, Ms. Beavers admits that "it appears that Marilyn Beavers became aware of the fire at some point, and came into contact with the fire at some point" (Dkt. No. 193, at 3).  Ms. Beavers does not clearly admit or deny that she attempted to extinguish the fire.  To the extent that Ms. Beavers denies that she attempted to extinguish the fire, she cites no materials in the record to support such a denial.  Accordingly, the Court considers this fact undisputed for the purposes of BRK's motion for summary judgment.  Fed. R. Civ. P. 56(e)(2).

adequate alarm. They bring the following products liability claims against BRK in their amended

complaint: (1) strict liability; (2) failure to warn; (3) defective design; (4) negligence; (5) breach

of express warranty; (6) breach of the implied warranty of merchantability; and (7) breach of the

implied warranty of fitness for a particular purpose (Dkt. No. 27, at 19-33).[2] Ms. Beavers, Mr.

Singleton, and Mr. Hatchett also allege wrongful death and survival damages claims against BRK

(Dkt. No. 27, at 16-17).

To prevail on their products liability claims against BRK, plaintiffs bear "the burden of

proving both (1) that the [smoke alarm] was defective when it left [BRK's] control such that it was

unreasonably dangerous and (2) that the defect caused the injury." *Madden v. Mercedes-Benz

USA, Inc.*, 481 S.W.3d 455, 458-59 (Ark. App. 2016), *reh'g denied* (Mar. 9, 2016) (citations

omitted). BRK argues that it is entitled to summary judgment on all of plaintiffs' claims for two

reasons. First, BRK argues that plaintiffs cannot establish that the smoke alarm was defective or

unreasonably dangerous (Dkt. No. 90, at 4-6). Second, BRK argues that, even if plaintiffs could

establish that the smoke alarm was defective, they could not establish that the smoke alarm's

failure to sound a timely alarm proximately caused the deaths of Ms. Beavers and the children (*Id.*,

at 6-8).

## V.     Elements Of Causes Of Action

BRK is correct in that all products claims alleged by plaintiffs require proof of a defect or

unreasonably dangerous condition of the product and that all claims require proof that the alleged

defect was a proximate cause of the decedents' injuries. Further, proof of proximate cause is a

requirement for plaintiffs to succeed on their wrongful death and survival damages claims. *Scott*

---

[2] Plaintiffs do not include a separate count for their claim of breach of the implied warranty of fitness for a particular purpose, but they refer to such a claim in their amended complaint (Dkt. No. 27, ¶¶ 148, 167).

*v. Cent. Arkansas Nursing Centers, Inc.*, 278 S.W.3d 587, 595 (Ark. App. 2008) ("In a wrongful-death case, the plaintiff must show that the defendant's negligence was the proximate cause of the decedent's death.").

## A. Strict Products Liability

For a plaintiff to recover under a theory of strict liability, he or she must prove both: (1) that the product was in a defective condition when it left the defendant's control such that it was unreasonably dangerous and (2) that the defective condition was a proximate cause of the plaintiff's injury. Ark. Code Ann. § 4-86-102(a); *Southern Co. v. Graham Drive-In,* 607 S.W.2d 677, 679 (Ark. 1980); *Madden*, 481 S.W.3d at 458-59); *see also* Ark. Model Jury Inst., Civil 1008 (2017). There are three general varieties of product defects: manufacturing defects, design defects, and inadequate warnings. *See generally West v. Searle & Co.*, 806 S.W.2d 608 (Ark. 1991). Here, Ms. Beavers, Mr. Singleton, and Mr. Hatchett appear to allege strict liability claims based on defective design and inadequate warnings (Dkt. No. 27, ¶ 113).

To be actionable, a plaintiff must present evidence of the type of defect which renders the product not merely inadequate, but one which poses an actual danger to persons or property. A "defective condition" is one that renders a product unsafe for reasonably foreseeable use and consumption. Ark. Code Ann. § 16-116-102(2). A product is "unreasonably dangerous" if it is dangerous to an extent beyond that which would be contemplated by the ordinary and reasonable user, assuming the ordinary knowledge of the community or similar users as to its characteristics, propensities, risks, dangers, and proper and improper uses, as well as any special knowledge, training, or experience possessed by the user. Ark. Code Ann. § 16-116-102(7).

It is not necessary that a plaintiff prove the defect by direct proof. However, in the absence of direct proof, the plaintiff must negate other possible causes of the injury not attributable to the

defendant, thereby raising a reasonable inference that the injury was caused by a defective product. *Southern Co.*, 607 S.W.2d at 679. Furthermore, it must be proven that the product was defective while it was still in the control of the defendant. *Cockman v. Welder's Supply Co.*, 580 S.W.2d 455, 457-58 (Ark. 1979); *see also Chandler v. Wal-Mart Stores Inc.*, 498 S.W.3d 766, 770 (Ark. App. 2016), *reh'g denied* (Oct. 5, 2016), *review denied*, 2017 Ark. 103 (2017).

The Arkansas Supreme Court discussed the issue of causation in the context of strict products liability in *Southern Co.*:

> Strict liability eliminates both privity and negligence; but it still does not prove the plaintiff's case. He still has the burden of establishing that the particular defendant has sold a product which he should not have sold, and that it has caused his injury. This means that he must prove, first of all, not only that he has been injured, but that he has been injured by the product. The mere possibility that this may have occurred is not enough, and there must be evidence from which the jury may reasonably conclude that it is more probable than not . . . .

607 S.W.2d at 679 (quoting William L. Prosser, *The Fall of the Citadel (Strict Liability to the Consumer)*, 32 ATL L.J., at 21 (1968)).

In *Chandler*, plaintiffs argued that they were not required to eliminate all other possible causes of the fire because they supplied direct proof that defendants' product—the serum—was supplied in a defective condition. 498 S.W.3d at 771. The court determined that, even assuming that plaintiffs did supply direct proof, plaintiffs still had to meet proof with proof on the issue of causation and show that it was more than a mere possibility that the product caused the alleged damages. *Id.*

As the *Chandler* court further explained:

> Strictly speaking, since proof of negligence is not in issue, res ipsa loquitur has no application to strict liability; but the inferences which are the core of the doctrine remain, and are no less applicable. The plaintiff is not required to eliminate all other possibilities, and so prove his case beyond a reasonable doubt. As on other issues in civil actions, it is enough that he makes out a preponderance of probability.

> It is enough that the court cannot say that reasonable men on the jury could not find it more likely than not that the fact is true.

*Id.* (quoting *Southern Co.*, 607 S.W.2d at 679 (quoting William L. Prosser, *Handbook on the Law of Torts* § 102, at 672 (4th ed. 1971))).  Thus, causation cannot be based on mere conjecture and speculation.  *Chandler*, 498 S.W.3d at 771.  Arkansas law requires that plaintiff present "substantial evidence" that "negates other possible causes of failure of the product not attributable to the defendant." *Madden*, 481 S.W.3d at 459 (citing *Higgins v. Gen. Motors Corp.*, 699 S.W.2d 741 (Ark. 1985)).  "Substantial evidence is that which is of sufficient force and character that it will compel a conclusion one way or another. It must force or induce the mind to pass beyond suspicion and conjecture." *Id.*

### B.     Negligent Failure To Warn Claim

Under Arkansas law, a manufacturer of a product has a duty to give a reasonable and adequate warning of dangers inherent or reasonably foreseeable in its use, and a violation of this duty is negligence.  Ark. Model Jury Inst., Civil 1002 (2017).  As a general rule, there is a duty to warn the ultimate user of a product of the risk of the product.  *See West*, 806 S.W.2d at 613.  This duty exists under either a negligence theory or a strict-liability theory.  *Id.*

However, as in the strict-liability claims discussed above, even assuming that BRK had a duty to warn about the smoke detector given its intended or foreseeable use, plaintiffs are still required to show that this failure to warn was the proximate cause of the decedents' alleged injuries.  *See Hergeth, Inc. v. Green*, 733 S.W.2d 409, 411-12 (Ark. 1987); *see also Chandler*, 498 S.W.3d at 772.

Ms. Beavers, Mr. Singleton, and Mr. Hatchett specifically allege that BRK failed to warn adequately "of the true risks of their smoke detectors, including that the smoke detector Model 1839-WN's electronic contacts could corrode and fail to sound an audible warning in the presence

of smoke from a nearby fire . . . ." (Dkt. No. 27, ¶ 116). Further, they allege that BRK provided "inadequate post-marketing warnings and instruction because BRK knew, or should have known, that there was reasonable evidence that Defendant BRK's smoke detector's electrical contacts would corrode and fail to provide an audible warning of a nearby fire . . . ." (*Id.*, ¶ 118).

## C. Defective Design

Before strict liability is imposed for a design defect, the plaintiff must show that the product was in a defective condition which rendered it unreasonably dangerous. *West v. G.D. Searle & Co.*, 879 S.W.2d 412, 414 (Ark. 1994). Likewise, for liability to be imposed for negligent design, the plaintiff must demonstrate negligence in the design of the product that was the proximate cause of the damages. *See Forrest City Mach. Works, Inc. v. Aderhold*, 616 S.W.2d 720, 726 (Ark. 1981).

Ms. Beavers, Mr. Singleton, and Mr. Hatchett claim that BRK's "smoke detector Model 1839-WN is defective in design because it lacks efficacy and poses a greater likelihood of injury than other similar fire safety devices on the market and is more dangerous than ordinary consumers could reasonably foresee." (Dkt. No. 27, ¶ 123).

## D. Negligence

Negligence and strict liability are not mutually exclusive claims. More than one theory of liability is permissible in a products liability claim. *Nationwide Rentals Co. v. Carter*, 765 S.W.2d 931, 933 (Ark. 1989); *W.M. Bashlin Company v. Smith,* 643 S.W.2d 526, 529 (Ark. 1982), *reh'g denied* Jan. 31, 1983. Here, Ms. Beavers, Mr. Singleton, and Mr. Hatchett allege negligent "design, formulation, testing, manufacture, marketing, sale, and distribution" of the smoke detector (Dkt. No. 27, ¶ 131); negligent "advertising and sale" of the smoke detector (*Id.*, ¶ 132); negligent "design, testing, manufacture, marketing, sale and distribution" of the smoke detector (*Id.*, ¶ 133);

and negligent labeling and issuing of pre-marketing and post-marketing warnings (*Id.*, ¶ 134). These negligence claims require a showing of duty, breach, and proximate cause. *See* Ark. Model Jury Inst., Civil 1001, 1002, 1003 (2017).

### E. Breach of Warranty Claims

Breach of warranty and strict products liability claims are "essentially the same" insofar as both require a product defect attributable to the defendant. *Higgins,* 699 S.W.2d at 742. A defendant may demonstrate that it is entitled to summary judgment because plaintiff failed to present evidence of a defect, and the presence of a defect is a common element essential to both claims. *Madden*, 481 S.W.3d at 460. A court is not required to address or negate every element of a claim. *Golden Tee, Inc. v. Venture Golf Schs., Inc.,* 969 S.W.2d 625, 632-33 (Ark. 1998).

#### 1. Express Warranties

Ms. Beavers, Mr. Singleton, and Mr. Hatchett allege that BRK created an express warranty that its smoke detector "was safe and effective for use by individuals such as the Decedents." (Dkt. No. 27, ¶ 139). A failure to demonstrate reliance on an express warranty dooms the claim. *See Madden*, 481 S.W.3d at 463.

#### 2. Merchantability And Fitness Warranties

To establish a breach of the implied warranty of merchantability, the gravamen of such a claim is that the product is not suited for its ordinary purpose. *See Lakeview Country Club, Inc. v. Superior Prods.,* 926 S.W.2d 428, 431 (Ark. 1996)*; Purina Mills, Inc. v. Askins,* 875 S.W.2d 843, 847 (Ark. 1994); *Lee v. Martin*, 45 S.W.3d 860, 864-65 (Ark. App. 2001); Ark. Model Jury Inst., Civil 1010 (2017). Further, to recover on claims for breach of the express and implied warranties of merchantability and fitness, plaintiffs are required to show that the breach, *i.e.*, the alleged unfitness of the product or its unmerchantable condition, was the proximate cause of the decedents'

injuries.  *See E.I. Du Pont de Nemours and Co. v. Dillaha*, 659 S.W.2d 756, 757 (Ark. 1983); *Chandler*, 498 S.W.3d at 773.

### VI.   Product Defect

Ms. Beavers, Mr. Singleton, and Mr. Hatchett have the burden of proving that the smoke alarm was defective.  *See Campbell Soup Co. v. Gates*, 889 S.W.2d 750, 753 (Ark. 1994) ("In a product liability case, a plaintiff must prove that the product in question was in a defective condition at the time it left the hands of the particular seller.").  BRK argues that Ms. Beavers, Mr. Singleton, and Mr. Hatchett cannot meet this burden because they have no evidence that the smoke alarm failed to sound or sounded later than it should have sounded (Dkt. No. 90, at 5).  BRK argues that, to the contrary, "[j]oint testing performed by all experts, including plaintiffs' experts, has established unequivocally that the alarm sounded" (*Id.*).  In support of this claim, BRK provides the opinion of Dr. Daniel Gottuk, who states that, based upon his examination of the smoke alarm, "it is clear from enhanced soot deposition evidence that it did sound" (Dkt. No. 88-1, ¶ 7).

Ms. Beavers, Mr. Singleton, and Mr. Hatchett devote the majority of their response to attacking Dr. Gottuk's conclusion that the smoke alarm at issue sounded the night of the fire (Dkt. No. 192, at 4-12).  They attack the reliability of enhanced soot deposition, the method used by Dr. Gottuk, and argue that, even if enhanced soot deposition was a reliable method for determining if a smoke alarm sounded, Dr. Gottuk's conclusion does not resolve whether the smoke alarm at issue was defective.  First, plaintiffs argue that, "[i]f latent soot patterns exist in a detector from a previous smoke event, they can lead to a false positive conclusion by investigators[,]" meaning Dr. Gottuk's conclusion was unreliable because he failed to "independently establish that the smoke detector had not previously sounded when exposed to smoke in the residence" (*Id.*, at 9).  Second, they argue that enhanced soot deposition cannot be used to determine when a smoke alarm

sounded during a fire, meaning "[i]t cannot be determined from soot patterns that the alarm did not sound very late in the subject fire, possibly after occupants were already disabled" (*Id.*, at 10).

Ms. Beavers, Mr. Singleton, and Mr. Hatchett's arguments regarding the reliability and limitations of enhanced soot deposition are certainly relevant, but they do nothing to satisfy *plaintiffs'* burden of proving that the smoke alarm was defective at the time it left the hands of the particular seller, BRK. Plaintiffs offer almost no evidence suggesting that the smoke alarm failed to sound or provided an inadequate alarm.

Ms. Beavers, Mr. Singleton, and Mr. Hatchett primarily rely on the affidavit of Dr. B. Don Russell, "a forensic electrical engineer with extensive experience in investigating the performance and reliability of smoke detectors as an electronic product" (Dkt. No. 191-5, ¶ 2). In his affidavit, Dr. Russell states that the smoke alarm at issue "incorporates ionization detection technology[,]" and that extensive testing "has established definitively that ionization technology will not detect the presence of smoke products in a timely fashion under . . . slow developing and/or smoldering fire conditions" (*Id.*, ¶ 13). According to Dr. Russell, "[e]xtensive testing of the technology in BRK's 1839 detector shows that a room compartment can be fully filled with smoke at toxic, dangerous levels without the detector sounding an alarm" (*Id.*). Dr. Russell notes that Ms. Beavers and the children "were found deceased, with some occupants still in beds. This is a common scenario where individuals do not receive a timely warning of the presence of a fire until after they are mentally impaired due to breathing carbon monoxide and other toxic gases over a period of time" (*Id.*, ¶ 15). Based on these alleged facts, Dr. Russell concludes that, "[i]t is highly likely that the cause of death of the occupants in the subject matter was an unacceptably late sounding of the BRK smoke detector which alarmed only after conditions in the home were untenable" (*Id.*, ¶ 16).

Ms. Beavers, Mr. Singleton, and Mr. Hatchett also offer the affidavit of Roger B. Tate, a forensic fire protection and mechanical engineer (Dkt. No. 191-4). In his affidavit, Mr. Tate states that his "understanding of the circumstances of the fire is based on [his] review of the investigation records of the public authorities" (*Id.*, ¶ 1). In addition to reviewing these materials, Mr. Tate was present during the testing of the smoke alarm (*Id.*). According to Mr. Tate:

> Autopsy photos show direct burns to Marilyn Beavers' hands, forearms, face, and upper back, near the neck. These burns indicate direct contact with the fire at some point in time. She was found in a bathroom with one of her children lying on top of her. Aside from the one child she had with her, the other three children were found in the bedroom. While these facts showed that Marilyn Beavers took some action during the fire and thus was awake at some point, they did not indicate that she was wakened by a smoke alarm as opposed to the direct effects of the fire itself. It is also clear that the fire was well underway when she became aware of it. The positions of the children do not indicate that they awakened during the fire for more than a few moments, only that they may have been in some distress before succumbing to smoke.

(*Id.*, ¶ 4). Mr. Tate concludes that:

> The fact that none of the five decedents were awakened with sufficient time to escape the fire makes it unlikely that the smoke alarm in [Ms. Beavers' apartment] was functioning effectively on the night of the subject fire. Though plausible explanations could be made for any one individual to have slept through the sounding of a fully functional smoke alarm, the probability of five individuals sleeping through such an alarm is low.

(*Id.*, ¶ 5). Mr. Tate does not explain how, as a forensic fire protection and mechanical engineer, he is qualified to draw these conclusions.

To the extent Ms. Beavers, Mr. Singleton, and Mr. Hatchett provide an affidavit from Jennifer Gray, Ms. Beavers' neighbor who contacted the Jacksonville Fire Department after smelling smoke (Dkt. No. 191-1), Ms. Gray's statements are not sufficient to establish product defect. Ms. Beavers, Mr. Singleton, and Mr. Hatchett claim that Ms. Gray asserts in her affidavit "that she never heard a smoke alarm on the morning of the fire . . . and states a belief that if an alarm had sounded, that she would have heard it because she would 'hear kids playing at her house

all the time during normal hours and when the television and other noise was going on'" (Dkt. No. 192, at 3).

On this record, the Court finds that BRK is entitled to summary judgment because Ms. Beavers, Mr. Singleton, and Mr. Hatchett fail to provide proof that the subject smoke alarm was defective, an essential element of their claims against BRK. *See Crawford v. Sears Roebuck & Co.*, 295 F.3d 884, 885 (8th Cir. 2002) (affirming the district court's dismissal of plaintiff's product liability action where the district court held that "there was a failure of proof on an essential element of the plaintiff's case, namely, that [the defendant] had supplied the [product] in a defective condition"). There is insufficient evidence in the record to support Dr. Russell's theory that the smoke alarm failed to provide an adequate warning because it utilized ionization detection technology. Dr. Russell's theory is premised on the assumption that the fire in Ms. Beavers' apartment was a "slow developing and/or smoldering fire" (Dkt. No. 191-5, ¶¶ 13, 16). However, he does not offer any evidence, and there is no record evidence, tending to show that the fire in Ms. Beavers' apartment was a slow developing or smoldering fire. In fact, the evidence in the record submitted by plaintiffs tends to show the opposite (Dkt. No. 191-2, at 11, 23-25, 33-34). Therefore, to the extent that Dr. Russell's theory is even valid, it is unsupported by record evidence. Plaintiffs simply cannot defeat summary judgment by providing an affidavit from Dr. Russell— who did not even attend the inspections of the smoke alarm (Dkt. No. 197, at 5)—in which he states that the smoke alarm must have been defective because it used ionization detection technology and "all occupants died" (Dkt. No. 191-5, ¶ 12).

Mr. Tate and Ms. Gray's affidavits also are insufficient to defeat summary judgment on the issue of product defect. Mr. Tate essentially concludes that the smoke alarm failed to give an adequate alarm because "none of the five decedents were awakened with sufficient time to escape

the fire" (Dkt. No. 191-4, ¶ 5).  However, "[t]he mere fact of an accident, standing alone, . . . does not make out a case that the product was defective."  *Harrell Motors, Inc. v. Flanery*, 612 S.W.2d 727, 729 (Ark. 1981).  The statements made by Ms. Gray in her affidavit, that she did not hear a smoke alarm in her neighbor's apartment when the fire ignited at approximately 3:00 a.m., do not "induce the mind to pass beyond conjecture as to liability for a defect on the part of" BRK. *Yielding v. Chrysler Motor Co.*, 783 S.W.2d 353, 356 (Ark. 1990).  Critically, neither Mr. Tate nor Ms. Gray's statements provide any evidence the smoke alarm was defective when it left BRK's control.  *See Campbell Soup*, 889 S.W.2d at 753 ("In a product liability case, a plaintiff must prove that the product in question was in a defective condition at the time it left the hands of the particular seller.").

The Court finds that plaintiffs fail to produce proof of product defect, an essential element of their claims against BRK.  They lack direct proof of product defect on the record evidence in this case.  Further, plaintiffs fail to negate sufficiently other possible causes of the injury not attributable to BRK's product on this record evidence so that a reasonable juror could conclude the injury was caused by BRK's product.  Therefore, the Court must enter summary judgment in favor of BRK on plaintiffs' product liability claims.

## VI.     Proximate Cause

### A.     Arkansas Law Regarding Proximate Cause

Proximate cause is usually an issue for the jury to decide, and when there is evidence to establish a causal connection between the negligence of the defendant and the damage, it is proper for the case to go to the jury.  *McGraw v. Weeks,* 930 S.W.2d 365 (Ark. 1996).

"Proximate cause becomes a question of law only if reasonable minds could not differ." *Craig v. Traylor,* 915 S.W.2d 257, 260 (Ark. 1996).  "Proximate cause is defined as 'that which

in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred.'" *Id.* (quoting *Williams v. Mozark Fire Extinguisher Co.,* 888 S.W.2d 303, 305 (Ark. 1994)). "Of course, proximate cause may be proved by either circumstantial or direct evidence. It is, however, necessary that there be evidence that would tend to eliminate other causes that may fairly arise from the evidence and that the jury not be left to speculation and conjecture in deciding between two equally probable possibilities." *St. Paul Fire & Marine Ins. Co. v. Brady*, 891 S.W.2d 351, 353-54 (Ark. 1995) (internal citations omitted). "It is enough that the plaintiff introduce evidence from which reasonable men might conclude that it is more probable than not that the event was caused by the defendant." *Hill v. Maxwell*, 448 S.W.2d 9, 10-11 (Ark. 1969). "Substantial evidence is evidence of sufficient force and character to compel a conclusion one way or the other with reasonable certainty; it must force the mind to pass beyond suspicion or conjecture." *Hall v. Grimmett*, 885 S.W.2d 297, 299 (Ark. 1994).

"The original act or omission is not eliminated as a proximate cause by an intervening cause unless the latter is in itself sufficient to stand as the cause of the injury." *State Farm Mut. Auto. Ins. Co. v. Pharr,* 808 S.W.2d 769, 771 (Ark. 1991). "The intervening cause must be such that the injury would not have been suffered except for the act, conduct, or effect of the intervening cause totally independent of the acts or omissions constituting the primary negligence." *Id.* "The mere fact that other causes intervene between the original act of negligence and the injury for which recovery is sought is not sufficient to relieve the original actor of liability if the injury is the natural and probable consequence of the original negligent act or omission and is such as might reasonably have been foreseen as probable." *Id.*

## B. Specific Allegations Of Proximate Causation

Ms. Beavers, Mr. Singleton, and Mr. Hatchett in their operative amended complaint make specific allegations regarding proximate cause.  They contend:

> The smoke detector Model 1839-WN inside Marilyn Beavers' residence failed to issue an adequate warning when smoke filled her residence.  As a direct and proximate result of the smoke detector's failure to sound an audible alarm in the presence of smoke from a nearby fire, Marilyn Beavers and her four children suffered fatal injuries.

(Dkt. No. 27, ¶¶ 67-68).[3]  Any theory that the smoke detector failed to timely sound or sounded early enough, long enough, or loudly enough to be effective is not pleaded in the operative amended complaint.  That was not the defect or the proximate cause alleged (Dkt. No. 199, at 12-13).  At this point in the litigation, plaintiffs may not amend their complaint without defendants' written consent or the Court's permission.  Fed. R. Civ. P. 15(a)(2).  Ms. Beavers, Mr. Singleton, and Mr. Hatchett do not represent that they have defendants' written consent to amend, nor have Ms. Beavers, Mr. Singleton, and Mr. Hatchett sought the Court's permission in a pending formal motion to amend.

## C. Procedural History Relevant To Proximate Causation

The parties engaged in discovery, including agreed upon testing of the smoke detector.  Then, the Housing Authority defendants filed a motion for summary judgment, attaching the affidavit of Dr. Daniel Gottuk (Dkt. No. 56-2, Gottuk Aff.).  Dr. Gottuk stated in part that, based upon his examination of the smoke alarm, "it is clear from enhanced soot deposition evidence that

---

[3]  The Court previously denied plaintiffs' motion to amend complaint and motion to amend the motion to amend complaint (Dkt. Nos. 68, 77, 155).  The Court notes that, for purposes of this analysis, plaintiffs did not seek to amend or alter these allegations in their proposed amended complaint; instead, they repeated these allegations in their proposed amended complaint (*see* Dkt. No. 77-2, ¶¶ 36 ("Upon information and belief, the one smoke detector/alarm located in the hallway of the apartment did not sound."), 68 ("As a direct and proximately result of the smoke detector's failure to sound an audible alarm in the presence of smoke from a nearby fire, Marilyn Beavers and her four children suffered fatal injuries.")).

it did sound" (Dkt. No. 88-1, ¶ 7).  The Housing Authority defendants also note that Dr. Gottuk's conclusion "is consistent with the physical evidence which suggests that the smoke alarm was displaced from the ceiling and fell to the floor at some point after the fire" (Dkt. No. 57, at 8 (citing Dkt. No. 88-1, ¶¶ 11, 13)).

Dr. Gottuk also opined in relevant part:

As an expert, I can confidently state that the smoke alarm's horn sounded.  There is tell-tale evidence left on the smoke alarm itself that demonstrates that its horn sounded.  This evidence is consistent with the scientific technical literature, and NFPA 921, and experimental testing conducted under my supervision.

. . . From my evaluation of the soot deposition around the smoke alarm horn opening in this case, it is my expert opinion that the horn sounded during the fire which occurred on or about March 22, 2012.

. . .

At some point during the course of the fire, the smoke alarm was displaced from the ceiling and fell to the floor. . . .  The photo attached hereto. . . shows a large scratch in the ceiling next to the displaced smoke alarm.

Photographs taken shortly after the fire which demonstrates the location where the smoke alarm was lying on the floor after the fire.  As shown in the photo attached. . . there is a clear ring where the smoke alarm was sitting on the floor and there is soot around the remainder.

From a review of all the evidence, the smoke alarm sounded on the morning of March 22, 2012.  Marilyn Beavers was awake at the time of the fire and attempted to extinguish the fire, thereby sustaining burns.  The smoke alarm's horn did sound for a period of time and, at some point, was displaced from the ceiling and fell to the floor.

(Dkt. No. 88-1, ¶¶ 8, 9, 11, 12, 13).

In response to the Housing Authority defendants' motion for summary judgment, Ms. Beavers, Mr. Singleton, and Mr. Hatchett filed a motion for additional testing on the smoke detector, stating in pertinent part, "[T]he Plaintiffs propose that the cover of the smoke detector be opened to allow the examination of the internal components.  This would involve lifting up the horn to see if there is soot on the horn as alleged by the expert who filed the affidavit[, referring to

Dr. Gottuk's affidavit]. There also may be a requirement to do testing on the horn to determine whether or not the expert's affidavit[, referring to Dr. Gottuk's affidavit,] is correct as to whether or not the horn sounded." (Dkt. No. 75, ¶ 5). Over objection, and with certain conditions imposed, the Court permitted the testing (Dkt. Nos. 156, 175). After such testing, Ms. Beavers, Mr. Singleton, and Mr. Hatchett present no record evidence from any expert that the smoke detector failed to sound.

### D. Record Evidence Relevant To Causation

The Court will examine the record evidence relevant to causation as argued by Ms. Beavers, Mr. Singleton, and Mr. Hatchett and defendants.

#### 1. Plaintiffs' Purported Expert Evidence

##### a. Dr. B. Don Russell

In an effort to establish a genuine issue of material fact regarding causation, as it relates to proffered expert evidence, Ms. Beavers, Mr. Singleton, and Mr. Hatchett primarily rely on the affidavit of Dr. Russell (Dkt. No. 191-5). In his affidavit, Dr. Russell states that the smoke alarm at issue "incorporates ionization detection technology[,]" and that extensive testing "has established definitively that ionization technology will not detect the presence of smoke products in a timely fashion under . . . slow developing and/or smoldering fire conditions" (*Id.*, ¶ 13). According to Dr. Russell, "[e]xtensive testing of the technology in BRK's 1839 detector shows that a room compartment can be fully filled with smoke at toxic, dangerous levels without the detector sounding an alarm" (*Id.*). Dr. Russell notes that Ms. Beavers and the children "were found deceased, with some occupants still in beds. This is a common scenario where individuals do not receive a timely warning of the presence of a fire until after they are mentally impaired due to breathing carbon monoxide and other toxic gases over a period of time" (*Id.*, ¶ 15). Based on these

facts alleged, Dr. Russell concludes that "[i]t is highly likely that the cause of death of the occupants in the subject matter was an unacceptably late sounding of the BRK smoke detector which alarmed only after conditions in the home were untenable . . . ." (*Id.*, ¶ 16). He does not opine that the smoke detector failed to sound.

Dr. Russell did not inspect the smoke detector. He opines that the enhanced soot deposition methodology used by Dr. Gottuk was not a reliable basis for an expert opinion that the alarm sounded. He states, in relevant part:

> The technique of soot pattern evaluation used by Mr. Gottuk, often referred to as acoustic agglomeration, has not been established by independent peer review to be reliable under the wide range of conditions that may occur in residential fires. Therefore, this technique cannot be used to determine that the smoke detector sounded in the subject fire or that it sounded in a timely manner to allow occupants to escape in said fire. . . .

(*Id.*, ¶ 6). The Court previously denied efforts to exclude Dr. Gottuk's testimony on this basis (Dkt. No. 178). Ms. Beavers, Mr. Singleton, and Mr. Hatchett's arguments regarding the reliability and limitations of enhanced soot deposition are certainly relevant, but they do nothing to satisfy *plaintiffs'* burden of proving that the smoke alarm failed to sound and that failure proximately caused plaintiffs' damages. Ms. Beavers, Mr. Singleton, and Mr. Hatchett offer almost no evidence suggesting that the smoke alarm failed to sound or provided an inadequate alarm.

Further, Mr. Russell essentially attempts to challenge "ionization detection technology." (Dkt. No. 191-5, ¶¶ 13-14). With respect to this topic, he states:

> It is highly likely that the cause of death of the occupants in the subject matter was an unacceptably late sounding of the BRK smoke detector, which alarmed only after conditions in the home were untenable, with high levels of toxic gasses and low visibility due to heavy smoke. In experiments I have conducted on many occasions, I have demonstrated that untenable conditions, sufficient to cause the death of individuals can occur in fires without an ionization detector sounding a timely alarm.

(Dkt. No. 191-5, ¶ 16).

Specifically, in regard to proximate cause, the Court concludes that there is insufficient evidence in the record to support Dr. Russell's theory that the smoke alarm failed to provide an adequate warning because it utilized ionization detection technology. As explained, his theory is premised on the assumption that the fire in Ms. Beavers' apartment was a "slow developing and/or smoldering fire" (Dkt. No. 191-5, ¶¶ 13, 16). He does not offer any evidence, and there is no evidence in the record, tending to show that the fire in Ms. Beavers' apartment was a slow developing or smoldering fire; the record evidence submitted by Ms. Beavers, Mr. Singleton, and Mr. Hatchett tends to show the opposite (Dkt. No. 191-2, at 11, 23-25, 33-34).

Dr. Russell also attempts to challenge Dr. Gottuk's opinions on the basis that "[s]oot deposits on a smoke detector horn cannot be uniquely linked to a specific fire." (Dkt. No. 188-8, ¶ 12). He suggests that, absent proof the smoke detector never previously sounded, Dr. Gottuk's opinions are unreliable. There is no record evidence that Ms. Beavers experienced a prior fire or smoke event causing the smoke detector in unit 3A to sound before the March 2012 fire. In fact, all record evidence indicates that Ms. Beavers did not experience such an event before the March 2012 fire (Dkt. No. 197, 197-1 to 197-6 (citing deposition testimony of various witnesses to confirm none witnessed the smoke detector sound)). The Court acknowledges that Mr. Singleton testified as to a prior smoke event at Christmas 2011 due to dressing in the oven, but he testified the smoke detector did not sound during that event (Dkt. No. 188-6, at 8 ("Q. Did you go check the smoke alarm? A. It didn't go off, so no.")). Further, there is record evidence that, around the time of and after that event in 2011, the Housing Authority defendants completed work orders on Ms. Beavers' apartment, unit 3A, and confirmed that the smoke detector in her unit was in working order (Dkt. No. 56-1, ¶ 5).

### b.      Roger Tate

Ms. Beavers, Mr. Singleton, and Mr. Hatchett also offer the affidavit of Roger B. Tate, a forensic fire protection and mechanical engineer (Dkt. No. 191-4).  In his affidavit, Mr. Tate states that his "understanding of the circumstances of the fire is based on [his] review of the investigation records of the public authorities" (*Id.*, ¶ 1).  In addition to reviewing these materials, Mr. Tate was present during the testing of the smoke alarm (*Id.*).  According to Mr. Tate:

> Autopsy photos show direct burns to Marilyn Beavers' hands, forearms, face, and upper back, near the neck.  These burns indicate direct contact with the fire at some point in time.  She was found in a bathroom with one of her children lying on top of her.  Aside from the one child she had with her, the other three children were found in the bedroom.  While these facts showed that Marilyn Beavers took some action during the fire and thus was awake at some point, they did not indicate that she was wakened by a smoke alarm as opposed to the direct effects of the fire itself. It is also clear that the fire was well underway when she became aware of it.  The positions of the children do not indicate that they awakened during the fire for more than a few moments, only that they may have been in some distress before succumbing to smoke.

(*Id.*, ¶ 4).

Mr. Tate also offers the following affidavit testimony:

> There was one smoke alarm installed in Unit 3A at the time of the subject fire.  The alarm had been mounted to the ceiling in the hallway, near the doors to the bedrooms.  It was in a location that was open to the kitchen space, where the fire originated, and it was not impeded from responding by being behind a door or partition.
>
> Examinations of the subject smoke alarm and its associated wiring showed that the alarm was a BRK Model 1839 WN alarm, manufactured in 1993.  The alarm was not equipped with a battery for power and it required power form a 120 volt alternating current source.  The two power conductors for the subject alarm were connected to the electrical power at the time of the subject fire.  The places on the conductors where they parted were severed by electrical activity.  Thus it appears that the subject smoke alarm was not impaired due to a lack of electrical power. However, the conductors were severed as heat in the subject fire damaged the electrical insulation.  The shadowing of the soot on the floor showed that the alarm was lying on the floor before the fire ended.  By the time Mr. Tom VanHoveln, a maintenance man for the complex, arrived at Unit 3A, the smoke alarm conductors were already severed and the alarm was lying on the floor.  Thus, Mr. VanHoveln

could not have heard the subject smoke alarm sounding. In my document review, no one other than Mr. VanHoveln stated that they heard a smoke alarm at Unit 3A.

In the July 2017 examination, the cover of the smoke alarm was opened. This exposed the horn of the device for examination. The tip of the opening in the horn did have a slightly darker deposition of soot than the remainder of the plastic surface. If one interprets this soot pattern as evidence that the horn has sounded, it is not evidence that the alarm was effective or operating as it should have. The research literature on the topic of soot deposition in smoke alarms is very limited. I was able to locate only four published papers. While the papers conclude that a sounding horn can produce an identifiable pattern on a horn, it does not always produce a soot pattern. The research studies did not control for how long the horn sounded, the decibel level of the horn itself, or the density of the smoke. Whether a smoke alarm has adequate sensitivity and thus sounds at the proper time was beyond the scope of the research. (See copies of these published papers which are attached to this affidavit).

The soot evidence gives no information as to whether the subject smoke alarm sounded early enough, long enough, or loudly enough to be effective. It is possible that it did in fact sound on the night of the subject fire, but after the decedents had already been overcome by smoke.

(*Id.*, ¶¶ 6-9).

   Mr. Tate concludes that:

The fact that none of the five decedents were awakened with sufficient time to escape the fire makes it unlikely that the smoke alarm in [Ms. Beavers' apartment] was functioning effectively on the night of the subject fire. Though plausible explanations could be made for any one individual to have slept through the sounding of a fully functional smoke alarm, the probability of five individuals sleeping through such an alarm is low.

(*Id.*, ¶ 5).

   Mr. Tate does not state that the smoke detector did not sound. He confirms the smoke detector was on the ceiling at some point during the fire, not impaired by a lack of electrical power, and was laying on the floor before the fire ended. Mr. Tate essentially concludes that the smoke alarm failed to give an adequate alarm because "none of the five decedents were awakened with sufficient time to escape the fire" (Dkt. No. 191-4, ¶ 5). The doctrine of *res ipsa loquitur* is not applicable on the facts of this case. *See Barker v. Clark*, 33 S.W.3d 476, 480 (Ark. 2000) (requiring

four essential elements to be established for the doctrine to apply: "(1) the defendant owes a duty to the plaintiff to use due care; (2) the accident is caused by the thing or instrumentality under the control of the defendant; (3) the accident that caused the injury is one that, in the ordinary course of things, would not occur if those having control and management of the instrumentality used proper care; and (4) there is absence of evidence to the contrary."). His opinion as it relates to proximate cause if of limited value.

### 2. Plaintiffs' Other Record Evidence

In a further effort to establish proximate causation, Ms. Beavers, Mr. Singleton, and Mr. Hatchett provide an affidavit from Jennifer Gray, Ms. Beavers' neighbor who contacted the Jacksonville Fire Department after smelling smoke (Dkt. No. 191-1). Ms. Beavers, Mr. Singleton, and Mr. Hatchett claim that Ms. Gray asserts in her affidavit "that she never heard a smoke alarm on the morning of the fire . . . and states a belief that if an alarm had sounded, that she would have heard it because she would 'hear kids playing at her house all the time during normal hours and when the television and other noise was going on'" (Dkt. No. 192, at 3).

Ms. Gray, in her affidavit, states in pertinent part:

I woke up that morning at 5:50 a.m. because my alarm went off and I immediately smelled smoke.

. . .

While all of this was going on I did not hear a fire detector or smoke alarm. While I was walking around the house early that morning I think I would have heard it. It was dead silent that morning in my apartment and in her apartment. Seeing as how I use to hear kids playing at her house all the time during normal hours when the television and other noise was going on, I think I would have heard it. That morning I didn't have a television or radio on and there were no sounds at all. It was dead quiet.

While walking around the exterior of her apartment I did not hear a fire detector or smoke alarm.

When the doors were removed and they entered Ms. Beavers' apartment, I did not hear a fire detector or smoke alarm.

(Dkt. No. 188-1, Gray Aff., ¶¶ 2, 17-19).

The statements made by Ms. Gray in her affidavit, that she did not hear a smoke alarm in her neighbor's apartment, do not induce the mind to pass beyond speculation and conjecture; this evidence is not substantial. *Hall*, 885 S.W.2d at 298-99. Even if this Court accepts Ms. Gray's statements as true and determines for purposes of analyzing the pending motion that Ms. Gray did not hear a smoke alarm in her neighbor's apartment, that evidence does not tend to eliminate other causes that may fairly arise from the evidence. The jury will be left to speculation and conjecture in deciding between equally probable possibilities. It is possible the jury could conclude that the smoke detector failed to sound, which is why Ms. Gray did not hear it. It is possible the jury could conclude that Ms. Beavers awoke to the fire, battled the blaze resulting in her injuries, and knocked the smoke detector off the ceiling before it had the chance to sound, consistent with Ms. Gray's affidavit and with some physical evidence at the scene. Nothing in the record makes one of these probable possibilities more or less likely. Both of these probable possibilities are consistent with Ms. Gray's proffered testimony. The Court concludes her testimony bears on the issue of proximate cause but determines it is insufficient record evidence to defeat defendants' motion for summary judgment.

The purpose of the smoke detector is to provide notice of the fire to the occupants. It cannot be disputed that Ms. Beavers and her children were awake "moments" before the fire started. It is undisputed that "[o]n March 22, 2012, at or around 2:00 a.m., Marilyn Beavers, decedent, shared a telephone conversation with her fiance, Furlandare Singleton, and the children, Decedents Dequan Singleton, Syndi Singleton, Haylee Singleton, and Emily Beavers." (Dkt. No. 27, ¶ 34). It also is undisputed that, "[m]oments after the family's 2:00 a.m. phone conversation,

a fire ignited in Apartment 3-A Max Howell Place, on South Simmons Street." (Dkt. No. 27, ¶ 35). These are the words used by plaintiffs in their operative amended complaint (*Id.*). Undisputed record evidence supports the statements made in plaintiffs' operative amended complaint (Dkt. No. 188-2, at 30 (discussing telephone records that confirm the call); 188-6, at 11 (Mr. Singleton's deposition testimony confirming he spoke with all of the children during that call)). The Court acknowledges that Mr. Singleton testified in his deposition that, during the conversation Ms. Beavers "was already laying down, and actually started to fall asleep on the phone, you know." (Dkt. No. 188-6, at 117-18). Further, plaintiffs argue "moments" does not equate to "instantly" (Dkt. No. 192, at 15). The Court has construed all record facts in the light most favorable to plaintiffs when reaching its decision.

It also cannot be disputed that, "[u]pon information and belief, Decedent Marilyn Beavers recognized the blaze and fought in an effort to extinguish the fire and save her children. Decedent Marilyn Beavers was without aid of a fire extinguisher. Decedent Marilyn Beavers suffered multiple severe burns on her hands, arms, forehead, and neck from her futile efforts to put out the fire." (Dkt. No. 27, ¶¶ 37-39).

In their response to the City defendants' motion for summary judgment, Mr. Singleton and Mr. Hatchett concede that the Pulaski County Coroner, who pronounced Marilyn Beavers, Haylee Singleton, Dequan Singleton, Emily Beavers, and Syndi Singleton dead on the scene of the accident at 10:08 a.m. "was unable to determine the approximate time of death for each decedent" (Dkt. No. 148, at 4). Further, it cannot be disputed that "[r]esponding officers found Decedent Marilyn Beavers lying on her back with Decedent Haylee Singleton cradled to her chest, Decedents Dequan Singleton and Emily Beavers in a bedroom together, next to one another, and Decedent Syndi Singleton lying in her bed face down. At or around 10:08 a.m., Pulaski County Coroner

Gerone Hobbs pronounced all five persons dead on the scene. Coroner Hobbs was unable to determine the approximate time of death for each decedent; however, all Decedents suffered from smoke inhalation, which was listed as the cause of death for each decedent." (Dkt. No. 27, ¶¶ 54-56). Undisputed record evidence supports these statements in plaintiffs' operative amended complaint (Dkt. No. 188-2, at 10, 25 (discussing where decedents were located); 188-2, at 30 (discussing opinion of Dr. Peretti regarding time and cause of death)).

As BRK points out: "Jurors cannot speculate, as they would be required to here, as to when the smoke alarm sounded, how long after smoke reached the alarm it sounded, when plaintiffs learned of the fire, how plaintiffs learned of the fire, how much time plaintiffs would have had to escape the apartment upon learning of the fire, and how much additional time plaintiffs would have had to escape the apartment if the alarm sounded sooner." (Dkt. No. 197, at 10). Further, as BRK points out, there is no record evidence, and will be no evidence, as to when Ms. Beavers became aware of the fire in relation to when decedents became unconscious nor will there be evidence of how much time she spent trying to put out the fire. There is no record evidence, and will be no evidence, as to when the alarm sounded in relation to when decedents became unconscious. Therefore, there is and will be no evidence that decedents lacked sufficient time to escape the fire as a proximate result of any claimed issue with the smoke detector (Dkt. 88, at 3).

### 3.    Record Evidence Cited By Defendants

Defendants, at various points in their motions, rely upon the following record evidence regarding causation, and the Court has reviewed all record evidence before reaching its conclusions in this case. Overall, the Court agrees with Ms. Beavers, Mr. Singleton, and Mr. Hatchett that evidence of the type cited by defendants generally is relevant to the issues of comparative negligence or fault and intervening proximate cause. Further, some of this evidence

bears on witness credibility, which is solely a matter left to the jury. The Court has not factored this into its proximate cause determination. The Court has construed all record evidence in the light most favorable to plaintiffs.

According to documents from an interview with Jacksonville Police Department, Ms. Gray admitted that "she was usually a light sleeper but could not sleep that night. Gray advised she could always hear the kids screaming or moving around in 3A. Gray advised at approximately 0045 hours, she took a sleeping pill to go to bed. Gray advised at approximately 0550 hours, her alarm went off. Gray advised when she woke up, she smelled smoke inside her apartment . . . ." (Dkt. No. 188-2, at 21). Again, any line of inquiry regarding these matters would bear on Ms. Gray's credibility, which is solely a matter left to the jury. The Court does not consider this.

Put into context, both Mr. Tate and Ms. Gray's affidavits appear drafted to respond to record allegations regarding Tom VanHoveln, one of two maintenance men for the complex. Mr. VanHoveln was interviewed by the Jacksonville Police Department and stated that, after he had made one trip to the scene and not noticed anything out of the ordinary at approximately 6:15 a.m., "he went to the office and he received a phone call from [Bobby] Snow [the other maintenance man for the complex] stating he observed fire damage at the rear of 3A. VanHoveln advised he arrived back at the residence at approximately 0730 hours. VanHoveln advised he and Snow took the screen door off and entered 3A through the front door. VanHoveln advised he observed smoke inside and everything was 'charred.' VanHoveln advised he noticed water on the floor and he heard the smoke detector going off. VanHoveln advised he went to the hallway and noticed the family was deceased. VanHoveln advised he and Snow immediately exited the residence and told Gray to call 911." (Dkt. No. 188-2, at 22).

There is record evidence that the State Crime Laboratory criminalist opined that, upon visual inspection, it appeared the wires to the smoke detector had been cut (Dkt. No. 179-3). If the wires to the smoke detector had been cut, it would not have had electricity to operate. This smoke detector did not have a battery; it was hard wired (Dkt. No. 188-4, ¶ 7). This directly contradicts the position taken by plaintiffs' expert, Mr. Tate, who opines that the two power connectors for the subject alarm were connected to the electrical power at the time of the subject fire and that the places on the conductors where they parted were severed by electrical activity (*Id.*). He opines the smoke detector was not impaired due to a lack of electrical power (*Id.*). Instead, he opines that the conductors were severed as heat in the subject fire damaged the electrical insulation (*Id.*).

Defendants suggest that "common sense" says that the physical evidence is consistent with the smoke alarm sounding and being knocked off the ceiling by someone during the fire. Dr. Gottuk addresses this physical evidence (Dkt. No. 88-1, ¶¶ 11, 13), and it is discussed at various points in the record evidence (Dkt. Nos. 56-2, ¶¶ 12-13; 188-2, at 23-26).

Further, the Housing Authority defendants point to record evidence in the coroner's report that Ms. Beavers' ethanol level was 0.14 percent, which is consistent with intoxication (Dkt. No. 57, at 5 n.2). This is a correct representation of the record (Dkt. No. 188-2, at 30). They maintain this "arguably played a role in this tragic event." (Dkt. No. 57, at 5 n.2). The Court acknowledges that Mr. Singleton, who spoke with Ms. Beavers moments before the fire began, claims she did sound like she was intoxicated (Dkt. No. 188-6, at 12).

Further, under the lease, as relevant to this dispute, Ms. Beavers agreed "[t]o provide reasonable care (including changing batteries) and perform interim testing of smoke detectors to [sic] they are in working order." (Dkt. No. 56-1, Dwelling Lease, ¶ VII.G.).

### E.       Conclusion As To Proximate Cause

Having examined all record evidence and drawing all reasonable inferences in favor of Ms. Beavers, Mr. Singleton, and Mr. Hatchett from that record evidence, this Court concludes that proximate cause is a question of law because reasonable minds could not differ.  Ms. Beavers, Mr. Singleton, and Mr. Hatchett have failed to come forward with sufficient record evidence of proximate causation that would ensure the jury would not be left to speculation and conjecture. The record evidence suggests equally probable possibilities, and plaintiffs have not come forward with sufficient record evidence from which reasonable jurors might conclude that it is more probable than not that the event was caused by one or more of the defendants.  The record evidence of causation does not pass beyond suspicion and conjecture and compel a conclusion one way or the other.  For these reasons, the Court grants summary judgment to defendants on the issue of proximate cause.

### VII.   Supplemental Motion For Summary Judgment

In its supplement to its motion for summary judgment, BRK argues that discovery responses submitted by Mr. Hatchett provide an additional ground for summary judgment (Dkt. No. 179).  BRK states that per these discovery responses, which are attached to BRK's motion, "it is the position of [Mr. Hatchett] that the wires of the alarm had been cut at the time of the fire and there was no electricity that would have allowed the alarm to sound" (*Id.*, at 3).  In response to this argument, Ms. Beavers states that she "has never taken a similar position that the alarm was not powered as described in the discovery requests" (Dkt. No. 192, at 22).  She also argues that "[i]f anything, the Supplement highlights the existence of genuine questions of material fact in this case, and BRK's Motion for Summary judgment should be denied" (*Id.*, at 23).  Mr. Hatchett and Mr.

Singleton adopted Ms. Beavers' response (Dkt. No. 194). Mr. Hatchett does not provide a separate response to BRK's supplemental motion for summary judgment.

The Court finds that Mr. Hatchett's discovery responses provide an additional ground for entering summary judgment in favor of BRK on Mr. Hatchett's claim, as he takes the position that the smoke alarm did not provide an adequate warning because the wires providing power to the alarm were cut prior to the fire. Mr. Hatchett's responses are not binding on Ms. Beavers or Mr. Singleton, but for the reasons previously stated in this Order, BRK is entitled to summary judgment on all claims.

**VIII. Conclusion**

The Court grants Mr. Singleton and Mr. Hatchet's motion to adopt (Dkt. No. 194). The Court grants BRK's motion for summary judgment and supplemental motion for summary judgment (Dkt. Nos. 88; 179). The Court denies as moot plaintiffs' request for a hearing on BRK's motion and supplemental motion. The Court dismisses with prejudice all claims against BRK.

So ordered this the 31st day of March, 2018.

Kristine G. Baker
United States District Judge